ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
          – and –
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

| | |
|---|---|
| CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>UNUM GROUP, RICHARD P. McKENNEY, JOHN F. McGARRY, STEVE ZABEL and DANIEL J. WAXENBERG, )<br><br>Defendants. ) | Civil Action No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff City of Taylor Police and Fire Retirement System ("plaintiff") alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Unum Group ("Unum" or the "Company"), Company press releases and earning calls, and analyst and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of purchasers of Unum securities between October 27, 2016 and May 1, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2. Unum offers disability, life, accident, critical illness, dental and vision insurance products and other related services marketed primarily through the workplace in the United States and the United Kingdom. Unum operates through five business segments: Unum U.S., Unum U.K., Colonial Life, Corporate, and Closed Block.

3. Unum's Closed Block segment consists of individual disability, group and individual long-term care, and other insurance products that the Company no longer markets. Unum's Closed Block segment currently includes approximately 950,000 active policies, with approximately 150,000 individual and 800,000 group member policies. The individual policies typically contain lifetime benefits and inflation coverage, which benefits, in general, pay for nursing homes, assisted living facilities, or in-home healthcare aides.

4. In assessing the performance of Unum's long-term care insurance, a key metric that investors pay close attention to is the product's interest adjusted loss ratio. To allay investor

- 1 -

concerns, Unum routinely misrepresented the expected range of its long-term care loss ratio throughout the Class Period and, therefore, the likelihood that the Company would experience excessive losses and need to take a crippling charge to its reserves. Indeed, after the Company took modest reserve charges in 2011 and 2014, it reassured investors that it had closely reviewed its long-term care portfolio to ensure that its underlying assumptions were extremely conservative and unlikely to lead to future losses. The long-term loss ratio range Unum had told investors to expect following this review was only 85% to 90%.

5.     Despite defendants' prior assurances, after the market closed on May 1, 2018, Unum stunned investors when it issued a press release entitled "Unum Group Reports First Quarter 2018 Results," which reported that the Company's first quarter 2018 loss ratio for its long-term care business had ballooned to 96.6%, compared to only 88.6% for the first quarter of 2017. The first quarter 2018 loss ratio also far exceeded the 85% to 90% long-term range and even the "low 90s" near-term range the Company had previously provided to investors.

6.     The next day, May 2, 2018, the Company hosted a conference call to discuss its first quarter 2018 financial results. On the call, defendant John F. McGarry, the Company's Chief Financial Officer ("CFO"), stated that the volatility experienced in Unum's long-term care business was expected to "continue in the future."

7.     On this news, the price of the Company's stock fell $8.12 per share, or nearly 17%, to close at $39.78 per share on May 2, 2018, on abnormally high trading volume.

8.     Throughout the Class Period, defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, defendants failed to disclose: (i) that the Company was experiencing a higher claims incidence for its long-term care business; (ii) that the Company was experiencing less favorable policy terminations in connection with its long-term care business; (iii) that the Company

had grossly miscalculated the actuarial assumptions underlying its long-term care business; (iv) that premium price hikes could not sustainably offset increasing losses related to the Company's long-term care business; (v) that the Company was subject to a much greater risk of catastrophic losses and major reserve charges than represented to investors; and (vi) that, as a result of the foregoing, the Company would not be able to maintain its long-term care interest adjusted loss ratio in the 85% to 90% range.

9. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, plaintiff and other Class members have suffered significant economic losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

12. Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District. In addition, the Company's corporate headquarters are located in this District.

13. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

14.     Plaintiff City of Taylor Police and Fire Retirement System purchased Unum securities at prices artificially inflated by defendants' fraud, as detailed in the attached Certification and incorporated herein.

15.     Defendant Unum Group is an insurance provider based in Chattanooga, Tennessee. Unum's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "UNM."

16.     Defendant Richard P. McKenney ("McKenney") was President, Chief Executive Officer ("CEO") and a director of Unum during the Class Period.

17.     Defendant John F. McGarry ("McGarry") was the CFO of Unum during the Class Period.

18.     Defendant Steve Zabel ("Zabel") was the President of Unum's Closed Block segment during the Class Period.

19.     Defendant Daniel J. Waxenberg ("Waxenberg") was the Chief Accounting Officer of Unum during the Class Period.

20.     The defendants referenced above in ¶¶16-19 are collectively referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false and misleading statements that artificially inflated the prices of Unum securities. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Unum's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to

material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Unum, together with its subsidiaries, provides a variety of insurance products. The Company's product lines include disability, life, accident, critical illness, dental and vision insurance products, and other related services. The Company primarily operates in the United States and the United Kingdom.

22.     For many years, Unum and other insurance providers sold long-term care insurance products. Long-term care policies generally cover costs not covered by other types of insurance associated with long-term care for individuals who are unable to perform self-care activities, such as dressing, bathing, eating, toileting, continence, transferring (getting in and out of a bed or chair) and walking. The need for these services may be due to age, infirmity, cognitive impairment or other reasons, and benefits include payments for services such as home care, assisted living, adult daycare, nursing homes and respite care.

23.     To ease the pressure on their bottom lines caused by long-term care policies, many insurers have obtained approval for double-digit premium rate increases. Insurers, however, note that such increases are generally insufficient to reach profitability for their older, more generous policies. As a result, insurers have taken billions of dollars of charges over the last decade. In the most dramatic example, in January 2018, General Electric Company ("GE") announced that, based on reserve testing primarily on its long-term care insurance portfolio, its financial services subsidiary would have to take a pre-tax charge of $9.5 billion ($6.2 billion after tax) for the fourth quarter of

2017 and was expected to make statutory reserve contributions of $15 billion over the next seven years.

24.     Unum discontinued offering individual long-term care policies in 2009 and group long-term care policies in 2012, other than features contractually allowable on existing group policies. As a result, during the Class Period, Unum reported its financial results for long-term care policies in its Closed Block operating segment, which includes products that the Company no longer offers. Although Unum no longer offered these policies, as of the end of fiscal 2017, nearly one million long-term care policies remained on the Company's books. For fiscal 2017, about 58% of Unum's Closed Block segment premium income was derived from group and individual long-term care policies. The potential for Unum to suffer massive losses as a result of these legacy policies made the Company's representations about their risks, claim rates, premium income, actuarial assumptions and the likelihood of reserve charges extremely important to investors.

25.     A key metric Unum provided to enable investors to assess risks in the Company's long-term care policies was the interest adjusted loss ratio. An insurance loss ratio measures the ratio of losses from the payment of claims and benefits to gains from premium income earned on a set of policies. The higher the loss ratio, the greater the claims in relation to earned premiums, the lower the profitability from these policies (or the greater the losses), and the higher the likelihood that the insurer will need to take statutorily mandated reserve charges or increase the amount of its reserves to cover future claims.

26.     Unum took reserve charges in fiscal 2011 and 2014 to service its long-term care business. After the last of these charges, for $453.8 million in Unum's fourth fiscal quarter of 2014, the Company reassured investors that it had appropriately reevaluated its actuarial assumptions underlying its reserve balance to reflect up-to-date information about the reserve discount rate, mortality, morbidity, persistency and premium rate increase assumptions. Unum blamed the need to

take a reserve charge related to its long-term care business primarily on a low interest rate environment that had persisted for several years. The reserve charge and reset transition was overseen by defendant McKenney, who transitioned from Unum's CFO to its CEO around this time.

**Defendants' Materially False and Misleading**
**Statements During the Class Period**

27.     The Class Period begins on October 27, 2016. After the market closed on October 26, 2016, the Company issued a press release, entitled "Unum Group Reports Third Quarter 2016 Results," which stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 93.8 percent in the third quarter of 2016 compared to 89.9 percent in the third quarter of 2015, due to a higher average size of new claims and less favorable mortality experience, as well as the unfavorable impact of a large group case moving to an individual policy ported status during 2016."

28.     On October 27, 2016, the Company hosted a conference call to discuss its third quarter 2016 financial results. During his prepared remarks, defendant McGarry told investors that the elevated claims rate for the quarter was due to a one-off event, namely the termination of the Company's largest group case, which had a unique auto-portability feature. Defendant McGarry stated: "In the absence of this unique case termination, our long-term care loss ratio would have been in the 85% to 90% range, consistent with our long-term expectations." He also stated that increased premiums and decreased benefits, through policy "landing spot" adjustments, would further de-risk the Company's long-term care portfolio, stating in pertinent part:

> *I continue to be pleased with the progress we are experiencing on achieving rate increases* on our in-force long-term care business. In addition to making good progress with state regulators and receiving several new rate increase approvals this quarter, we are continuing to see strong take-up of the landing spot option. *The landing spot has the same positive impact on reserves as rate increases but also has the added benefit of derisking the portfolio. Since future claims will be smaller*

***under the landing spot, the reserves will be somewhat less sensitive to future changes in reserve assumptions***.[1]

29.     Later, in response to an analyst question, defendant McGarry stated that the Company's active management of its long-term care block and the "extremely conservative" nature of the portfolio gave it confidence in the assumptions underlying its 2014 reset and, further, that nothing had occurred since then to cause the Company to question those assumptions. He stated in pertinent part:

> So let me talk to you about what some of those things have been. In 2014 we reset reserve assumptions. We placed those reserve assumptions on a best estimate basis using our current own experience, ***and our experience since then has been consistent with those expectations***.
>
> We also established – when we establish[ed] those reserves, we built in currently-filed rate increases using historical approval rates. Less than a third of those rate increase assumptions remain outstanding. ***We are making significant progress against them and feel very good about where the assumptions lie with only a small portion remaining***.
>
> That not only helps to support our reserve assumptions, but it also gives us room in the future to react to future adverse claims experience should it emerge. The third point I'd make is that our block's unique in the long-term care business, as approximately half of the block is group long-term care with employer funding and ***extremely conservative plan designs***. And because of that group coverage and employer funding, most employees terminate their employer-funded coverage when they leave the employer.

30.     That same day, Unum filed a quarterly report on Form 10-Q with the SEC that included the Company's long-term care results provided in the third quarter 2016 press release and earnings call. In addition, the Form 10-Q stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business ***will be relatively flat over the long term***, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures." The Form 10-Q also stated: "We

---

[1]     Emphasis has been added herein unless otherwise indicated.

continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly." The Form 10-Q was signed by defendants McKenney and McGarry.

31.     On December 15, 2016, Unum hosted its annual Investor Day.  During the Company's presentation to investors, defendant Zabel stated that, "when you look at the underlying results we feel pretty good about being within that range" of an interest adjusted loss ratio of 85% to 95% in long-term care.  As to the Company's 2014 loss reserve review, defendant Zabel stated that the Company was right on track in terms of claims experience, mortality and other issues affecting the Company's expected loss ratio, stating in pertinent part:

> As Jack mentioned, ***we've gone through our reserve adequacy study.  This year we feel really good about where we are at both from the liability assumptions whether it's incidence, mortality, duration of claim we feel pretty good all in about how that's going***.

*          *          *

> If you bring that back and just think all in how we're doing, ***we are really right on top of how we thought about the impact of our premium rate increases and our original reserve assumptions.  So we feel really good about the progress we have made there***.

32.     On February 1, 2017, the Company issued a press release, entitled "Unum Group Reports Fourth Quarter 2016 Results," which stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 89.1 percent in the fourth quarter of 2016 compared to 89.7 percent in the fourth quarter of 2015, due primarily to favorable mortality experience and the impact of persistency on active life reserves."

33.     On February 2, 2017, the Company hosted a conference call to discuss its fourth quarter and full year 2016 financial results.  During his prepared remarks, defendant McGarry stated that the long-term care segment had experienced favorable trends exceeding the Company's assumptions since the 2014 reset.  He stated in pertinent part:

> The year-over-year improvement was driven primarily by favorable mortality experience and the impact of persistency on active life reserves. ***I will point out that since the fourth quarter of 2014 reserve adjustment, the interest adjusted loss ratio***

*has been 89.4% within the long-term ratio of 85% to 90% that we expect. Adjusting for the impact of the large group case termination which impacted the loss ratio in the third quarter of 2016, this two-year cumulative loss ratio would be 88.1%.*

I continue to be pleased with the progress we're making in the Closed Block, particularly in the long-term care line. *The yields achieved on new money for the long-term care business have consistently exceeded the assumptions we have built into our reserves. Also, we continue to make good progress in achieving rate increases in our in-force long-term care business.*

34. Defendant McGarry stated that these positive trends in long-term care, among other "success[es]," would help carry Unum through 2017, stating in pertinent part:

We are executing very well on our strategies, with a focus on maintaining pricing discipline, generating strong persistency and growth in our core business segments, delivering on renewals to maintain our profit margins, and *meeting new money yield targets for the long-term care. This success gives us a great foundation to continue to build and grow upon as we move into 2017*.

35. On February 22, 2017, Unum filed an annual report on Form 10-K with the SEC that included the Company's long-term care results provided in the fourth quarter 2016 press release and earnings call. In addition, the 2016 Form 10-K stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures." The Form 10-K also stated: "We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly," and that the Company's strategy for its Closed Block segment remained "substantially unchanged." The Form 10-K was signed by defendants McKenney and McGarry.

36. On April 26, 2017, the Company issued a press release, entitled "Unum Group Reports First Quarter 2017 Results," which stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 88.6 percent in the first quarter of 2017 compared to 88.9 percent in the first quarter of 2016, primarily driven by favorable mortality experience."

37.     On April 27, 2017, the Company hosted a conference call to discuss its first quarter 2017 financial results.  During his prepared remarks, defendant McGarry elaborated on the Company's long-term care business, claiming that the loss ratio remained in line with expected levels and may even improve as future rate increases flowed through the business, stating in pertinent part:

> Importantly, the long-term care benefit ratio remains within our expected range of 85% to 90%.
>
> Overall, we continue to be pleased with the progress we're seeing in managing the long-term care block. ***Our claims experience has remained generally in line with our assumptions since the end of 2014***, when we updated our reserve assumptions to reflect our current view of the business.  We are also making good progress on rate increase approvals on our in-force business.  This past quarter, we received several rate increase approvals.  And though they tended to be in smaller states, we are tracking very well relative to the rate increase assumptions we've factored into our reserves.  Our reserve assumptions only factored in rate increase requests related to our 2014 program.
>
> We also discounted our assumptions, but what we thought we would realistically receive from state insurance departments.  ***We have not factored in any benefit from rate increases that we expect to file for in the future***.  In addition, the landing spot continues to be viewed favorably by regulators and policyholders are favoring this option in their elections.

38.     That same day, Unum filed a quarterly report on Form 10-Q with the SEC that included the Company's long-term care results provided in the first quarter 2017 press release and earnings call.  The Form 10-Q also stated that "[b]enefits experience in both our individual disability and long-term care lines of business ***remains within our range of expectations***."  In addition, the Form 10-Q stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business ***will be relatively flat over the long term***, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."  The Form 10-Q also stated: "We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly," and that the Company's

strategy for its Closed Block segment remained "substantially unchanged." The Form 10-Q was signed by defendants McKenney, McGarry and Waxenberg.

39.     On July 27, 2017, the Company issued a press release, entitled "Unum Group Reports Second Quarter 2017 Results," which stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 89.4 percent in the second quarter of 2017 compared to 92.6 percent in the second quarter of 2016, primarily driven by lower claims incidence."

40.     On July 28, 2017, the Company hosted a conference call to discuss its second quarter 2017 financial results. During his prepared remarks, defendant McGarry stated: "For the long-term care line, the interest adjusted loss ratio was 89.4% for the second quarter compared to the year-ago ratio of 92.6%. This improvement was driven primarily by lower claims incidence relative to last year's second quarter." He continued: "Looking at interest rates and new money yields for the long-term care portfolio, we continue to exceed our new money yield objective of 5% in the second quarter."

41.     That same day, Unum filed a quarterly report on Form 10-Q with the SEC that included the Company's long-term care results provided in the second quarter 2017 press release and earnings call. The Form 10-Q stated: "Benefits experience in both our individual disability and long-term care lines of business *remains within our range of expectations*." In addition, the Form 10-Q stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures." The Form 10-Q also stated: "We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly," and that the Company's strategy for its Closed Block segment remained "substantially unchanged." The Form 10-Q was signed by defendants McKenney, McGarry and Waxenberg.

- 12 -

42.     On October 25, 2017, the Company issued a press release, entitled "Unum Group Reports Third Quarter 2017 Results," which stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 93.3 percent in the third quarter of 2017 compared to 93.8 percent in the third quarter of 2016, due to the impact of a large group case moving to an individual policy ported status in 2016, partially offset by unfavorable policyholder lapses in the current quarter."

43.     On October 26, 2017, the Company hosted a conference call to discuss its third quarter 2017 financial results.  During his prepared remarks, defendant McGarry stated that the quarterly uptick in the long-term care interest adjusted loss ratio was an aberration due to unfavorable policy lapses and reassured investors that, overall, Unum was observing several favorable trends related to its long-term care business that would mitigate any increases in the long-term care loss ratio.  He stated in pertinent part:

> The elevation in the current benefit ratio is largely attributable to unusually unfavorable policyholder lapses.  Although we'd rather than not see this volatility, we're encouraged that *the underlying claims experience was consistent with historical norms*.
>
> *Other important factors related to long-term care – to the long-term care line continued to trend favorably this quarter*.  Our new-money yield in the quarter was again above our 5% assumption, just as it has been since resetting of that assumption in the fourth quarter of 2014.  In addition, we continue to make good progress with rate increases on the in-force business, with several additional approvals, *keeping us on pace to achieve, if not slightly exceed, the rate increase expectations assumed in our reserves*.  We continue to have productive discussions with our state insurance departments, and it's worth noting that other than the small amounts outstanding from our 2014 filings, no future rate increases are built into our current reserve assumptions.  With that said, we plan to actively pursue the future rate increases [where] justified.

44.     That same day, Unum filed a quarterly report on Form 10-Q with the SEC that included the Company's long-term care results provided in the third quarter 2017 press release and earnings call.  In addition, the Form 10-Q stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*,

but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures." The Form 10-Q also stated: "We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly," and that the Company's strategy for its Closed Block segment remained "substantially unchanged." The Form 10-Q was signed by defendants McKenney, McGarry and Waxenberg.

45.     On January 31, 2018, the Company issued a press release, entitled "Unum Group Reports Fourth Quarter 2017 Results," which stated in relevant part that the "interest adjusted loss ratio for the long-term care line of business was 93.1 percent in the fourth quarter of 2017 compared to 89.1 percent in the fourth quarter of 2016, primarily due to unfavorable policy terminations related to mortality experience."

46.     On February 1, 2018, the Company hosted a conference call to discuss its fourth quarter and full-year 2017 financial results. During his prepared remarks, defendant McGarry stated that the elevated adjusted loss ratio in long-term care was within recently revised near-term expectations of the "low 90s," and that this higher loss ratio was being offset by other favorable factors. He stated the following in pertinent part:

> *Two important factors related to the long-term care line continue to trend favorably this quarter*. First, our new money yield this quarter was, again, above our assumption of 5%, just as it has been since resetting that assumption in the fourth quarter 2014. Again, as we said in December, we're nearing the point where our reserve assumptions begin to reflect our rising new money yields. While long duration treasury yields have moved somewhat higher recently, credit spreads on bonds remain tight. Second, while it's a quiet quarter for rate increase approvals on inforce business, we still have a few large rate requests yet to be decided. Even without these, we're confident we will achieve the rate increase expectations assumed in our reserve assumptions. *It bears repeating that we assume no future rate increases in our current reserve assumptions*, though we intend to actively pursue future rate increases where justified.

47.     Later in the call, defendant McGarry clarified that, by the "low 90s," Unum meant that the interest adjusted loss ratio would not exceed 95%.

48.     Defendant McGarry also reassured analysts and investors that Unum's long-term care business was on substantially more stable footing than that of GE – which had recently taken a multibillion dollar reserve charge related to its long-term care business.  Defendant McGarry pointed to Unum's active management of its portfolio, continuous reassessment of the actuarial assumptions set in 2014 against observed trends, and the fact that there had been "no surprises" for investors, which was expected to "continue into the future," as reasons investors should take comfort in the quality of Unum's long-term care business, stating the following in pertinent part:

> *[W]e feel like we are in a very different place than GE is*.  First, I'd point out that the blocks are very different.  GE's block was a reinsured block, which removes them one step from the customer.  Our block was direct written.  So we directly control the underwriting and benefit guidelines in that block.  The other big difference is 85% of our insured lives are group long-term care.  They have a much younger profile.  They – and most of those actual group long-term care insureds are employer-funded as opposed to employee-funded, much smaller benefit levels, much more conservative plan designs.  The other – by comparison, the GE block was 100% long-term care and was a much older block than our block is.  *Second, we've aggressively and actively managed our block over time.  Since – I know, we've had 10 full-time actuaries dedicated to the block since 2012 and for a period, I was one of them*.  Between reserve increases and reserve charges, we've strengthened reserve margins over time by $4 billion in the block, and I will tell you within long-term care, timing matters.  The earlier you move, the better off you're going to be.  And so we have been an early adopter in that in the block.  *The third thing I'd say is, we did our comprehensive review of the long-term care block in 2014.  We provided a lot of resources to build sophisticated models.  We reset our assumptions to be consistent with our emerging experience.  And on an ongoing basis, monthly, we track our actual to assumed assumptions, and we provide you quarterly updates with that on an ongoing basis*.  The fourth thing I'd point out is we just concluded our 2017 reserve accuracy studies.  We had margin in our reserves, as a result of that analysis.  The other thing is we have no future rate increases assumed, although we intend to pursue them.  And then finally, we have a $1 billion difference between our GAAP reserves and stat reserves.  We believe these buffers insulate our capital plans.  We've been dealing with this problem for a long time.  I think our dealing with it is characterized by there's been no surprises.  As a result, we've kept you apprised on an ongoing basis of where we are and there has been no impact to our capital plans along the way.  *And we would expect that to continue into the future*.

49.     Similarly, in response to an analyst question about how he could be "confident" that the elevated loss ratio did not signal prolonged structural challenges to Unum's long-term care business, defendant McGarry stated that the intensity of the Company's review of the business and

recent mortality trends gave them confidence in their representations to investors.  He stated the following in pertinent part:

> Yes, so, part of the reason is we did our reserve review, our margin during 2017 and our reserves actually grow a little bit because we've been outperforming on the investment side.  But if you look at the big picture around long-term care and where we are with the reserves, there are a couple of factors.  One, 2017 was a very good year for the living.  You saw that in favorable individual life results across the industry.  Our risk in long-term care is a longevity risk, not a mortality risk.  So we were the other side of that coin.  That put pressure on long-term care results.  I would tell you old age mortality is very volatile.  We had low mortality in the fourth quarter, which contributed to that benefit ratio.  ***Today, we find ourselves facing one of the most virulent flu seasons in a decade, and we've already seeing some signs of that in our currently emerging results***.  So the business is volatile.  We're not going to react to single quarters.  We're going to look at long-term trends.  We've been looking at that over time.  We will continue to do so.  ***And one thing I will tell is we'll keep you apprised of that as it emerges, and we'll see how 2018 plays out, keep you posted along the way***.  And if we do have to adjust reserves as a result of emerging experience, we're confident that it will be – that it will not affect our capital plans because of the margins we have, because of the rate increase latitude and because of the gaps that difference we currently have built into our reserves.

50.     On February 21, 2018, Unum filed an annual report with the SEC on Form 10-K that included the Company's long-term care results provided in the fourth quarter 2017 press release and earnings call.  In addition, the 2017 Form 10-K stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business ***will be relatively flat over the long term***, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."  The Form 10-K also stated: "For 2018, although premium rate increases and higher investment margins have contributed positively to the interest adjusted loss ratios for our long-term care product lines, ***we expect that they will remain in the low 90 percent range***."  In addition, the Form 10-K stated: "We continuously monitor key indicators to assess our risks and attempt to adjust our business plans accordingly."  The Form 10-K was signed by defendants McKenney, McGarry, and Waxenberg.

51.     The statements referenced in ¶¶27-50 above were materially false and/or misleading when made because they misrepresented and/or failed to disclose the following adverse facts

pertaining to the Company's business, operations and financial condition, which were known to defendants or recklessly disregarded by them. Specifically, defendants failed to disclose:

(a)     that the Company was experiencing a higher claims incidence for its long-term care business;

(b)     that the Company was experiencing less favorable policy terminations in connection with its long-term care business;

(c)     that the Company had grossly miscalculated the actuarial assumptions underlying its long-term care business;

(d)     that premium price hikes could not sustainably offset increasing losses related to the Company's long-term care business;

(e)     that the Company was subject to a much greater risk of catastrophic losses and major reserve charges than represented to investors; and

(f)     that, as a result of the foregoing, the Company would not be able to maintain its long-term care interest adjusted loss ratio in the 85% to 90% range.

52.     Then, on May 1, 2018, after the market closed, Unum issued a press release entitled "Unum Group Reports First Quarter 2018 Results." In it, the Company reported that its first quarter 2018 loss ratio for its long-term care business had ballooned to 96.6%, compared to only 88.6% for the first quarter of 2017. This marked the third consecutive quarter in which the interest adjusted loss ratio had exceeded the 85% to 90% range, and the fifth of the past eight quarters dating back to Unum's second quarter of 2016. The interest adjusted loss ratio for the Company's long-term care business had **_averaged more than 92%_** during this two-year period. In addition, the 96.6% loss ratio for Unum's first quarter of 2018 significantly exceeded even the revised near-term expectations provided by the Company, signaling a much greater likelihood of losses than investors had been led to believe.

53. On May 2, 2018, the Company hosted a conference call to discuss its first quarter 2018 financial results. On the call, defendant McGarry stated that the volatility experienced in Unum's long-term care business was expected to "continue in the future."

54. On this news, the price of the Company's stock fell $8.12 per share, or nearly 17%, to close at $39.78 per share on May 2, 2018, on abnormally high trading volume.

55. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, plaintiff and other Class members have suffered significant economic losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

56. As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Unum securities as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Unum, their control over, and/or receipt or modification of Unum's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Unum, participated in the fraudulent scheme alleged herein.

57. The adverse developments at issue impacted the most significant revenue and profitability risks for the Company and the likelihood that Unum would suffer massive losses. The Individual Defendants, in particular, were directly responsible for overseeing and reporting on Unum's Closed Block segment and long-term care insurance policies and held themselves out to the

market as the representatives of the Company most knowledgeable on these topics. Accordingly, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION AND ECONOMIC LOSS

58. As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Unum securities and operated as a fraud or deceit on purchasers of Unum securities. As detailed above, when the truth about Unum's misconduct was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the securities' prices. The decline in Unum's share price was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price decline negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the prices of the Company's securities and the subsequent significant decline in the value of the Company's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

59. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Unum's business, operations and financial condition, as alleged herein. Before the time of plaintiff's purchases of Unum securities, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of Unum's securities to be artificially inflated. Plaintiff and other

Class members purchased Unum securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

60. At all relevant times, the markets for Unum securities were efficient markets for the following reasons, among others:

(a) Unum stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) according to the Company's 2017 Form 10-K, Unum had more than 221 million shares outstanding as of February 20, 2018, demonstrating a very active and broad market for Unum securities;

(c) as a regulated issuer, Unum filed periodic public reports with the SEC;

(d) Unum regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e) unexpected material news about Unum was rapidly reflected in and incorporated into prices for the Company's securities.

61. As a result of the foregoing, the markets for Unum securities promptly digested current information regarding Unum from publicly available sources and reflected such information in the prices of Unum securities. Under these circumstances, a presumption of reliance applies to plaintiff's purchases of Unum securities.

62. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding their business and operations,

- 20 -

positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Unum securities during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

64. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Unum stock was actively traded on the NYSE. As of April 30, 2018, there were over 221 million shares of Unum stock outstanding, held by thousands of shareholders. Record owners and other members of the Class may be identified from records maintained by Unum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

66. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Unum;

(c)     whether the prices of Unum securities were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

69.     Plaintiff incorporates the foregoing paragraphs by reference.

70.     Unum and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 22 -

71.     These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and other members of the Class in connection with their purchases of Unum securities.

72.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for Unum securities. Plaintiff would not have purchased Unum securities at the prices paid, or at all, if plaintiff had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

73.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of Unum securities.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

74.     Plaintiff incorporates the foregoing paragraphs by reference.

75.     The Individual Defendants acted as controlling persons of Unum within the meaning of §20(a) of the 1934 Act. By virtue of their positions, stock ownership, shareholder agreements and their power to control public statements about Unum, the Individual Defendants had the power and ability to control, and did control, the actions of Unum and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring that defendants violated the 1934 Act;

B.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

C.     Awarding plaintiff and the class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

D.     Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

E.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 25, 2018
        ROBBINS GELLER RUDMAN
          & DOWD LLP
        CHRISTOPHER M. WOOD, #032977
        CHRISTOPHER H. LYONS, #034853


          *s/ Christopher M. Wood*
        CHRISTOPHER M. WOOD

        414 Union Street, Suite 900
        Nashville, TN 37219
        Telephone: 615/244-2203
        615/252-3798 (fax)

        ROBBINS GELLER RUDMAN
          & DOWD LLP
        DAVID C. WALTON
        BRIAN E. COCHRAN
        655 West Broadway, Suite 1900
        San Diego, CA 92101
        Telephone: 619/231-1058
        619/231-7423 (fax)

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Unum Group.docx

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

CITY OF TAYLOR POLICE AND FIRE RETIREMENT SYSTEM ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Warren Police and Fire Ret. System v. Zebra Technologies Corp.,* No. 2:17-cv-04412 (E.D.N.Y.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

UNUM

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _14th_ day of _July_, 2018.

CITY OF TAYLOR POLICE AND FIRE
RETIREMENT SYSTEM

By: _____

Its: _CHAIRMAN_____

- 2 -

UNUM

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 03/08/2017 | 885 | $48.97 |
| 01/16/2018 | 2,180 | $56.55 |
| 05/02/2018 | 424 | $40.30 |

| Date<br>Sold | Amount of<br>Shares Sold | Price |
|---|---|---|
| 03/01/2018 | 885 | $49.29 |